# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

U.S. SECURITIES AND
EXCHANGE COMMISSION,

               Plaintiff,

   v.

HAL D. MINTZ and SABBY
MANAGEMENT, LLC,

               Defendants.

Civil Action No. 23-3201
(RMB/AMD)

**OPINION**

**APPEARANCES:**

Daniel J. Maher
Edward J. Reilly
U.S. SECURITIES & EXCHANGE COMMISSION
100 F. Street NE
Washington, D.C. 20549

   *On behalf of Plaintiff U.S. Securities & Exchange Commission*

Jay S. Auslander (*pro hac vice*)
Aari Itzkowitz (*pro hac vice*)
Michael Van Riper
WILK AUSLANDER LLP
825 Eighth Avenue, Suite 2900
New York, New York 10019

   *On behalf of Defendants Hal D. Mintz and Sabby Management LLC*

**RENÉE MARIE BUMB, Chief United States District Judge:**

This is a civil enforcement action by the U.S. Securities and Exchange Commission ("**SEC**" or "**Commission**") against Defendants Hal D. Mintz ("**Mintz**") and Sabby Management, LLC ("**Sabby**") (collectively, "**Defendants**") for violations of federal securities laws.  In the main, the SEC alleges that between March 2017 and May 2019 Mintz orchestrated a "naked" short-selling scheme involving the securities of 10 issuers in circumvention of Regulation SHO, to the tune of $2 million of ill-gotten gains.  [Compl. ¶¶ 1–8, Docket No. 1.]  Before the Court is Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  [Docket No. 10.]  Seeking partial dismissal of the SEC's Complaint, Defendants argue that a subset of the SEC's allegations—the "additional abusive trading" identified in paragraphs 96 through 99 of the Complaint, and Appendix A attached thereto (and to this Opinion)—fails to comply with the heightened pleading standards of Federal Rule of Civil Procedure 9(b).  They also contend that the SEC's claims for civil monetary penalties and disgorgement are time-barred, in part, pursuant to 28 U.S.C. § 2462.  Having considered the parties' submissions, the Court resolves the Motion without oral argument.  Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b).  For the reasons expressed herein, the Motion will be **GRANTED**, **in part**, and **DENIED**, **in part**.

\*   \*   \*

1

## I.  FACTUAL BACKGROUND[1]

As the SEC summarizes, "From at least March 2017 through May 2019, Mintz, a highly experienced trader, through Sabby, used his knowledge to game the markets and carry out Defendants' fraudulent scheme by repeatedly circumventing trading rules involving at least 10 issuers on behalf of two private funds managed by Defendants."  [Compl. ¶ 1.]  In particular, the SEC accuses Defendants of carrying out a fraudulent scheme involving two forms of abusive trading in violation of Regulation SHO and applicable federal securities laws.

First, Defendants allegedly mismarked sales of securities as "long," when they should have been marked as "short," because Defendants were not "deemed to own" the securities being sold at the time and did not have a net long position in such securities.  [*Id.* ¶ 2.]  This enabled them to disguise certain sell orders and avoid complying with Regulation SHO's "locate" requirements.  [*Id.* ¶¶ 2–3 (citing 17 C.F.R. § 242.200–242.204).]  Second, Defendants allegedly marked and sold certain shares "short" when they knew or were reckless in not knowing that they had ***not*** borrowed or located such shares, as required.  [*Id.* ¶ 2.]  These trades also failed to comply with the "locate" requirements of Regulation SHO and, for positions in which Defendants

---

[1] As explained below, see *infra* § III.A., the Court draws all factual allegations from the Complaint and accepts all well-pleaded allegations as true.  *See Evancho v. Fisher*, 423 F.3d 347, 350–51 (3d Cir. 2005) ("When considering a Rule 12(b)(6) motion, we are required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff.") (citations omitted).

failed to deliver the securities by their settlement date, constituted "naked" short selling. [*Id.*] Defendants' scheme allegedly enabled them to reap at least $2 million of ill-gotten gains. [*Id.* ¶ 3.] While their scheme is described in greater detail below, the Court only recites those factual allegations that it deems necessary to resolve the pending Motion to Dismiss. The parties agree that Defendants' Motion is not claim- or case-dispositive.

### A.    The Defendants.

Sabby is a Delaware limited liability company that was established in 2011. [Compl. ¶ 16.] Since July 12, 2013, Sabby has been registered with the SEC as an investment adviser. [*Id.*] During the period relevant to this action, Sabby maintained an office in Saddle River, New Jersey. [*Id.*]

Sabby's business consists of managing two private funds—Sabby Healthcare Master Fund, LTD (the "**Healthcare Fund**") and Sabby Volatility Warrant Master Fund, LTD (the "**Warrant Fund**") (collectively, the "**Private Funds**")—from which it earns management and performance fees. [*Id.*] The Healthcare Fund, a Cayman Islands entity, is a master hedge fund. [*Id.* ¶ 17.] At the beginning of the relevant period, it had a gross asset value of $400 million. [*Id.*] As of its most recent public filing, the Healthcare Fund had a gross asset value of $16 million and 28 beneficial owners. [*Id.*] As of September 30, 2022, Mintz held a 7.3% equity interest in the Healthcare Fund. [*Id.*]

The Warrant Fund, also a Cayman Islands entity, is a master private equity fund. [*Id.* ¶ 18.]  At the beginning of the relevant period, it had a gross asset value of $60 million.  [*Id.*]  As of its most recent public filing, the Warrant Fund had a gross asset value of $182 million and 73 beneficial owners.  [*Id.*]  As of September 30, 2022, Mintz held a 39.9% equity interest in the Warrant Fund.  [*Id.*]

Mintz, now a resident of Miami, Florida, was the principal and managing partner of Sabby during the relevant period.  [*Id.* ¶ 15.]  He had "primary responsibility for making investment decisions, including daily securities trading decisions, for the Private Funds."  [*Id.*]  The SEC alleges that, because of his position, "Sabby is liable for Mintz'[s] conduct."  [*Id.*]  During the relevant period, Sabby's investment strategy involved participating in secondary offerings by issuers, including common and convertible securities.  [*Id.* ¶ 37.]

On October 14, 2015, the SEC instituted cease-and-desist proceedings against Sabby for violations of Rule 105 of Regulation M of the Securities Exchange Act of 1934.  [*Id.* ¶ 16.]  The SEC imposed a cease-and-desist order, disgorgement of $184,747.10, and a civil penalty of $91,669.95.  [*Id.*]

## B.    Short Selling and Regulation SHO.

As this action regards an alleged "long[-]running fraudulent scheme involving abusive 'naked' short selling, order mismarking, and other violative trading" by

Defendants, [Compl. ¶ 1], the Court provides a brief overview of short selling and Regulation SHO.[2]

A "short sale" is defined as "any sale of a security which the seller does not own or any sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller." 17 C.F.R. § 242.200(a). "Short selling can be a logical trading strategy for a trader who believes that the price of shares is likely to decline over the near-term." *SEC v. Colonial Inv. Mgmt. LLC*, 659 F. Supp. 2d 467, 470 (S.D.N.Y. 2009) (citing *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 700 (2d Cir. 1998)). In a fairly recent case, the Supreme Court summarized the mechanics of a short-sale transaction:

> A typical short sale of a security is one made by a borrower, rather than an owner, of stock. In such a transaction, a person borrows stock from a broker, sells it to a buyer on the open market, and later purchases the same number of shares to return to the broker. The short seller's hope is that the stock price will decline between the time he sells the borrowed shares and the time he buys replacements to pay back his loan. If that happens, the seller gets to pocket the difference (minus associated transaction costs).

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 377 (2016). In principle, there is nothing wrong with short selling. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) ("[S]hort selling—even in high volumes— is not, by itself, manipulative."). "The Commission has long held the view that short selling provides the market with important benefits, including market liquidity and pricing efficiency." SEC Release No. 34-59748, 74 Fed. Reg. 18042, 18044 (Apr. 20,

---

[2] This background material is drawn from the Complaint, [see Compl. ¶¶ 24–36], and the Court's review of applicable law.

2009).  Still, "[a]lthough short selling serves useful market purposes, it also may be used to illegally manipulate stock prices."  *Id.*

In a "naked" short sale, by contrast, "the seller has ***not*** borrowed (or otherwise obtained) the stock he puts on the market."  *Manning*, 578 U.S. at 377 (emphasis added); *accord* Compl. ¶ 24 ("A 'naked' short sale generally refers to selling short without having borrowed or arranged to borrow securities to make delivery to the buyer within the standard settlement period [three days].").  Sometimes, sellers "intentionally fail to deliver securities as part of a scheme to manipulate the price of a security, or possibly to avoid borrowing costs associated with short sales."  *"Naked" Short Selling Antifraud Rule*, SEC Release No. 34-58774, 73 Fed. Reg. 61666, 61667 (Oct. 17, 2008).  This abusive practice can serve to "drive down a company's stock price."  *Id.* at 61670.  In 2004, the SEC adopted Regulation SHO "in part to address problems associated with persistent fails to deliver securities and potentially abusive 'naked' short selling."  *Id.* at 61667.

Regulation SHO thus requires broker-dealers to comply with a series of obligations.  First, Rule 200(g) of Regulation SHO requires broker-dealers to mark all sell orders of any equity security as "long," "short," or "short exempt."  17 C.F.R. § 242.200(g).  The Court refers to this provision as the "marking" requirement.  A sell order may be marked "long" only if the seller of the security is "deemed to own" it, *see id.* § 242.200(b)–(f) (outlining the circumstances under which a person shall be "deemed to own" a security), and the security to be delivered "is in the physical

possession or control" of the broker-dealer *or* the broker-dealer reasonably believes that it will be. *Id.* § 242.200(g)(1).  A seller of convertible securities is not "deemed to own" the underlying security until that person "has tendered such security for conversion or exchange." *Id.* § 242.200(b)(3).  "A sale order shall be marked 'short exempt' only if the provisions of § 242.201(c) or (d) are met."[3]  *Id.* § 242.200(g)(2).  Otherwise, any sale of a security that the seller does not own must be marked "short."  *See id.* § 242.200(a) and (g).

Second, *before* accepting a short sale order or effecting a short sale for its own account (with certain exceptions not relevant here), broker-dealers must document the source of the securities being sold.  17 C.F.R. § 242.203(b)(1)(iii).  Specifically, a broker-dealer must have borrowed the security, have entered into a bona-fide arrangement to borrow the security, or have reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due.  *See* 17 C.F.R. § 242.203(b)(1)(i)–(iii).  This is generally referred to as the "locate" requirement.  *See Elec. Trading Grp., LLC v. Banc of America Sec. LLC*, 588 F.3d 128, 135 (2d Cir. 2009).

Third, Regulation SHO requires participants of a registered clearing agency to immediately purchase shares to close out of a fail-to-deliver position in "threshold securities" if the fails to deliver persist for 13 consecutive settlement days.  *See* 17 C.F.R. § 242.203(b)(3).  Threshold securities are generally equity securities with large

---

[3] The Court observes that this action does not involve any "short exempt" securities.  [*See generally* Compl.]

and persistent "fails to deliver." *Id.* § 242.203(c)(6).  This is generally referred to as the "delivery" requirement.  *See Elec. Trading Grp.*, 588 F.3d at 135–36.

### C.    Mintz's Role in Sabby's Operations.

As noted above, Mintz had primary responsibility for making investment decisions for the Private Funds.  [Compl. ¶¶ 15, 37.]  The SEC further alleges that Sabby's policies and procedures vested Mintz with responsibility for "knowing whether the Private Funds had a net short or long position in an issuer's stock and whether each sale of an issuer's stock was a short sale or a long sale."  [*Id.* ¶ 38.]  In fact, Sabby's policies and procedures required Mintz or his trading designee to consult Sabby's trading records before a short sale order could be place, including (i) "a list of available locates provided on a daily basis from Prime Broker 1";[4] (ii) "Sabby's trading log to see how many shares of the issuer had been sold short so far that day"; and (iii) "short sales executed through brokers not reflected in Sabby's trading log."  [*Id.* ¶ 39.] "Mintz was responsible for reporting any instance where a locate was not properly obtained, for reviewing all short sale reports for accuracy, and for ensuring that all orders, including short sale orders, were marked correctly."  [*Id.* ¶ 40.]

---

[4] "Prime Broker 1" is alleged to be "a broker-dealer used by Sabby to maintain custody of the securities of both the Warrant Fund and the Healthcare Fund." [Compl. ¶ 21.]

### D.   The Alleged Fraud.

### 1.   Allegedly Violative Trading in Securities of Issuers 1 and 2.

In June 2018, the SEC alleges that Defendants engaged in a scheme to circumvent the requirements of Regulation SHO in connection with selling short millions of shares of the common stock of Issuer 1.[5]  [Compl. ¶ 41.]  The SEC also alleges that in January 2018 Defendants engaged in similarly fraudulent trading in the common stock of Issuer 2.[6]  [*Id.* ¶ 72.]  As Defendants do not challenge the sufficiency of the SEC's allegations concerning these trading schemes, the Court only sets forth a brief summary of their mechanics for the purpose of comparison with the allegations concerning the transactions identified in Appendix A of the Complaint.[7]

The scheme concerning Issuer 1 is alleged to have worked as follows:  First, Defendants entered into a securities purchase agreement with Issuer 1 on behalf of the Warrant Fund to exercise convertible preferred securities in exchange for Issuer 1's common stock at an approximately 20% discount to the market price.  [Compl. ¶ 42; *see also* ¶ 45 (describing the agreement's "reset provision" as a right to adjust the conversion price of the preferred securities to 80% of the volume-weighted average

---

[5] "Issuer 1" is alleged to be "a publicly traded Nevada corporation with its principal place of business in Palo Alto, California."  [Compl. ¶ 19.]  The common stock of Issuer 1 is also alleged to be listed on the Nasdaq Stock Market LLC.  [*Id.*]

[6] "Issuer 2" is alleged to be "a publicly traded Washington corporation with its principal place of business in San Diego, California."  [Compl. ¶ 20.]  The common stock of Issuer 2 is also alleged to be listed on the New York Stock Exchange.  [*Id.*]

[7] For ease of review, the Court attaches Appendix A to this Opinion and refers to it herein by the same name.

price of the common stock of Issuer 1 on the preceding trading day).]  But before exercising the convertible securities, Defendants submitted short sale orders as to Issuer 1's stock without first obtaining a "locate," as required by Regulation SHO.  [*Id.* ¶ 42.]  Almost immediately after those short sale orders were in place, Defendants executed their conversion rights to acquire Issuer 1's stock and attempted (unsuccessfully) to use those shares to cover their short sale positions.  [*Id.*]  According to the SEC, this scheme locked in an illicit 20% spread.  [*Id.*]  The SEC further alleges that Defendants would not have been able to do this if they had complied with the "locate" requirement.  [*Id.*]

The SEC further alleges that, as part of the scheme, "Defendants knowingly or recklessly submitted false and misleading order instructions to executing broker-dealers for the long sale of millions of shares of Issuer 1's common stock on behalf of the Warrant Fund when it did not have a net long position in the stock."  [*Id.* ¶ 43.]  Moreover, Defendants are alleged to have submitted order instructions for sale positions while misleading their executing broker-dealers by falsely representing to have obtained locates for Issuer 1's stock from their prime brokers when, in truth, they had not.  [*Id.*; *see also id.* ¶¶ 63–71 (describing how Mintz misled Executing Broker-Dealer A[8] by falsely stating that "locates" for their short sale orders had been provided

---

[8] "Executing Broker-Dealer A" is alleged to be "a broker-dealer used by Defendants to execute trades on behalf of both the Warrant Fund and the Healthcare Fund."  [Compl. ¶ 23.]

by Prime Broker 1 and Prime Broker 2[9] prior to the date on which Defendants tendered their preferred securities of Issuer 1 for conversion).]   Only after making these statements did Defendants tender their preferred securities for conversion.  [*Id.* ¶ 44.]  These actions "allowed Defendants to generate hundreds of thousands of dollars in ill-gotten gains for the Warrant Fund and led to Defendants' failure to deliver millions of shares of Issuer 1."[10]  [*Id.*]

The SEC also alleges that Defendants engaged in a violative trading scheme concerning the common stock of Issuer 2.  [Compl. ¶ 72.]  Between January 8 and 9, 2018, Defendants submitted orders to executing broker-dealers to sell short the common stock of Issuer 2 on behalf of the Private Funds while misrepresenting that they had obtained sufficient locates for such shares.  [*Id.* ¶ 73.]  They had not.  [*Id.*]  After submitting the short sale orders, on January 10, 2018, Defendants entered into a securities purchase agreement with Issuer 2 to acquire one million shares of its common stock.  [*Id.* ¶ 74.]  Defendants attempted to use these shares to satisfy their delivery obligations, but the shares were not delivered until January 12, 2018.  [*Id.*]  Accordingly, Defendants caused "fails-to-deliver" of thousands of shares of Issuer 2.  [*Id.*]  "As Defendants knew or were reckless in not knowing, the use of after-acquired shares to cover their short sales for which they had not obtained a locate at the time of

---

[9] "Prime Broker 2" is alleged to be "a broker-dealer used by Sabby to maintain custody of the securities of both the Warrant Fund and the Healthcare Fund." [Compl. ¶ 22.]

[10] For additional details concerning the scheme, see Compl. ¶¶ 45–71.

their short sale order could not cure their failure to comply with the locate requirement[]." [*Id.*]  The SEC alleges that Defendants "naked" sold short over 30,000 shares of Issuer 2.  [*Id.* ¶ 95.]  By selling these shares at market price and subsequently acquiring them through a securities purchase agreement at a substantially cheaper price per share, Defendants reaped ill-gotten proceeds of $134,000, and net profits of $49,000 for the Private Funds.[11]  [*Id.*]

### 2.   Additional Abusive Trading:  The Appendix A Transactions.

In addition to the allegedly violative trading activity described above, see *supra* § I.D.1., the SEC asserts that Defendants engaged in similar abusive activities in the securities of at least eight additional issuers.  [Compl. ¶ 96.]  This abusive trading—occurring between March 15, 2017 and May 6, 2019—is alleged to be detailed in Appendix A.[12]  [*Id.* ¶ 98.]  The SEC alleges that:

> As set forth in Appendix A, in each instance, Defendants knowingly or recklessly either submitted (a) materially false and misleading trade order instructions to executing broker-dealers for long sales on behalf of the Private Funds when the Private Funds did not have a net long position in the security and were not deemed to own the securities; or (b) submitted short sale trade instructions to executing broker-dealers for short sales on behalf of the Private Funds while making materially false and misleading representations that Defendants had obtained locates in connection with the short sales when in fact they had not obtained locates.

---

[11] For additional details concerning the scheme, see Compl. ¶¶ 75–95.

[12] Note that Issuers 1 and 2 in Appendix A are different from Issuers 1 and 2 as described above.  For clarity, the Court refers to the former as Issuers 1(A) and 2(A).

[*Id.*] Defendants engaged in this activity, the SEC asserts, because it was more profitable than following the requirements of Regulation SHO. [*Id.* ¶ 99.] They profited, the SEC explains, from the difference between their high sale proceeds from their abusive conduct (*i.e.*, "naked" short sales, short sales without locates, and/or mismarked long sales) and the cheaper price they paid to acquire the stock. [*Id.*] The SEC maintains that the Appendix A transactions are part and parcel of Defendants' fraudulent scheme to circumvent the requirements or Regulation SHO. [*Id.* ¶¶ 96–97.]

### E.   The Tolling Agreement.

The parties entered into an agreement to toll any statute of limitations applicable to the claims asserted in this action for a fixed period of time. [Compl. ¶ 109.] The agreement covers the period from December 2, 2022 through March 22, 2023, and the period from March 30, 2023 through June 30, 2023. [*Id.*] The total number of days tolled is 202. [*Id.*]

## II.   PROCEDURAL HISTORY

The SEC filed this action against Defendants on June 12, 2023, asserting that (i) Defendants violated § 10(b) of the Securities Exchange Act of 1934 ("**Exchange Act**"), 15 U.S.C. § 78j(b), and Rules 10b-5 and 10b-21, 17 C.F.R. § 240.10b-5 and 240.10b-21, promulgated thereunder (Counts I and II); (ii) Defendants violated §§ 204 and 206(4) of the Investment Advisers Act of 1940 ("**Advisers Act**"), 15 U.S.C. §§ 80b–4 and 80b–6, and Rules 204-2 and 206(4)-7, 17 C.F.R. §§ 275.204-2 and 275.206(4)-7, promulgated thereunder (Counts III and IV); and (iii) Mintz aided and

abetted the Advisers Act violations.  [Compl. ¶¶ 110–129.]  The SEC seeks permanent injunctions, disgorgement of ill-gotten gains plus prejudgment interest, and civil money penalties.  [*See* Compl. (Prayer for Relief); *see also id.* ¶ 10.]

On August 24, 2023, Defendants filed their Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  [Docket No. 10.]  They seek: (i) partial dismissal of Count I (the § 10(b) and Rule 10b-5 claim), to the extent that it relies on allegedly fraudulent transactions as to the eight issuers identified in Appendix A, maintaining that they are inadequately pled under the requirements of Rule 9(b); and (ii) partial dismissal of all claims, to the extent they rely on conduct that occurred prior to November 22, 2017, the date Defendants contend a five-year limitations period applies.  [Defs.' Mem. Supp. Mot. Dismiss at 1, 2–4, Docket No. 10-1 ("**Defs.' Br.**").]  The SEC opposes Defendants' Motion, arguing that it has alleged sufficient detail regarding the Appendix A transactions and that Defendants' conduct occurred within the limitations period of the applicable statute and/or that their argument is premature.  [Pl.'s Mem. Opp'n Mot. Dismiss at 1–3, Docket No. 14 ("**Pl.'s Opp'n**").]  Defendants also filed a reply.  [Defs.' Reply Mem. Supp. Mot. Dismiss, Docket No. 15 ("**Defs.' Reply Br.**").]  As the Motions are fully briefed, they are ripe for adjudication.[13]

As the SEC brings this action pursuant to § 21(d) and 21(e) of the Exchange Act, 15 U.S.C. § 78u(d) and 78u(e), and § 209(d) and 209(e) of the Advisers Act, 15

---

[13] On November 13, 2023, upon the retirement of the Hon. Kevin McNulty, this action was reallocated and reassigned to this Court.  [Docket No. 20.]

U.S.C. § 80b-9(d) and (e), [see Compl. ¶ 11], this Court exercises jurisdiction pursuant to §§ 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa, and §§ 209(d), 209(e), and 214 of the Advisers Act, 15 U.S.C. §§ 80b–9(d), 80b–9(e), 80b–14. *See also* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  Venue is proper in the District of New Jersey because the acts and transactions constituting alleged violations of the Exchange Act and the Advisers Act occurred in New Jersey and Defendant Sabby's principal place of business was in New Jersey during the relevant period.  *See* 15 U.S.C. §§ 78aa(a) and 80b–14(a).

## III.   LEGAL STANDARDS

### A.   Motion to Dismiss—Rule 12(b)(6).

A pleading is generally sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Under Rule 8, a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This requires the plaintiff to allege "more than mere labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

A complaint may be dismissed, in whole or in part, pursuant to Federal Rule of Civil Procedure 12(b)(6) when it appears beyond doubt that no relief could be granted

under any set of facts that could be proved. *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005) (citations omitted). When considering a Rule 12(b)(6) motion to dismiss, a court must accept as true all well-pleaded allegations in the complaint, including all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff. *Id.* at 350 (citations omitted). A court need not accept "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986). A court may "generally consider only the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

A district court's role in reviewing the sufficiency of a complaint is thus limited: the issue is not "whether the plaintiffs will ultimately prevail" but "whether they are entitled to offer evidence to support their claims." *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000). "When presenting a Rule 12(b)(6) motion, the defendant bears the burden to show that the plaintiff has not stated a claim." *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016) (citation omitted).

## B.   Heightened Pleading—Rule 9(b).

When an asserted claim sounds in fraud, as here, the plaintiff must comply with the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *In re*

*Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997).  Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The particularity requirement is "rigorously applied in securities fraud cases."  *In re Burlington*, 114 F.3d at 1417 (citations omitted).

"Although Rule 9(b) falls short of requiring every material detail of the fraud, such as the date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.' " *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (quoting *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 557 (D.N.J. 2001)).  Generally, courts cast this requirement in terms of alleging "all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *Id.* at 217 (quoting *In re Burlington*, 114 F.3d at 1422).  This level of particularity is critical to "place the defendant on notice of the 'precise misconduct with which it is charged.' " *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of America*, 361 F.3d 217, 223–24 (3d Cir. 2004)) (cleaned up).

Though the circumstances of the fraud must be alleged with particularity, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[14]  Fed. R. Civ. P. 9(b); *see SEC v. Dubovoy*, 2016 WL 5745099, at *5 (D.N.J.

---

[14] It bears noting that the Private Securities Litigation Reform Act of 1995 ("**PSLRA**"), 15 U.S.C. § 78u–4(b), requires private plaintiffs in securities fraud actions to plead scienter with particularity. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d

Sept. 29, 2016) (explaining that in a securities fraud action, the SEC need only allege facts that give rise to a plausible inference of scienter) (citing *SEC v. McGee*, 895 F. Supp. 2d 669, 683 (E.D. Pa. 2012)).

## IV.   DISCUSSION

Defendants seek partial dismissal of the SEC's Complaint for two principal reasons:  First, they believe that the SEC's § 10(b) and Rule 10b-5 claim (Count I) fails to meet the heightened pleading requirements of Rule 9(b) as to the transactions identified in Appendix A.  [Defs.' Br. at 2–3, 10–14.]  As noted above, Defendants focus on the Appendix A transactions and, at least at this stage, do not challenge the sufficiency of the allegations concerning trading in the securities of Issuers 1 and 2.  [Compl. ¶¶ 41–95; *see* Defs.' Reply Br. at 4 n.1.]  In support of partial dismissal, Defendants contend that the SEC has failed to adequately allege that Defendants made misstatements or acted deceptively in connection with the Appendix A trading and that Defendants acted with scienter.  [Defs.' Br. at 10–14.]  They also claim that the

---

242, 253 (3d Cir. 2009) ("Under § 78u–4(b)(2), 'a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b).' ") (quoting *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008)); *see also In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010) (outlining the "two exacting and distinct pleading requirements" that the PSLRA imposed); *In re Rockefeller Ctr. Props., Inc.*, 311 F.3d at 217 (reviewing the purposes of the PSLRA—"to restrict abuses in securities class-action litigation"—and observing that "Congress 'expressly intended' to 'substantially heighten' the existing pleading requirements") (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531, 534 (3d Cir. 1999)).  As several courts have noted, however, the PSLRA does not apply to the SEC.  *See, e.g.*, *SEC v. Kearns*, 691 F. Supp. 2d 601, 609 n.5 (D.N.J. 2010) (Simandle, J.) ("[T]he SEC is not subject to the PSLRA and need not plead scienter with particularity."); *In re Reserve Fund Secs. & Derivative Litig.*, 732 F. Supp. 2d 310, 318–19 (S.D.N.Y. 2010) (same).

SEC fails to distinguish between Mintz's conduct and Sabby's conduct.  [*Id.* at 14–16.]  Second, Defendants believe that the SEC's Exchange Act and Advisers Act claims are time-barred, in part.  [*Id.* at 16–20.]  They assert that 28 U.S.C. § 2462 precludes civil penalties and disgorgement for short sale trades that occurred prior to November 22, 2017.  [*Id.*]  The Court addresses these arguments in reverse order.

### A.   Statute of Limitations.

The Court first considers Defendants' argument that the SEC's Exchange Act and Advisers Act claims are time-barred, in part, to the extent that they are predicated on short sales that occurred prior to November 22, 2017.  [Defs.' Br. at 16–20.]  This is the operative date, Defendants claim, because 28 U.S.C. § 2462 requires certain civil enforcement matters to be commenced within five years of a claim's accrual date, and November 22, 2017 is five years prior to June 12, 2023 (the date the Complaint was filed), after taking into consideration a 202-day tolling period agreed to by the parties, [*see* Compl. ¶ 109].  Defendants thus argue that § 2462 prohibits the SEC from seeking civil penalties and disgorgement as to Sabby's trades in the securities of: (i) Issuer 1(A) (for trading between March 15 and March 17, 2017); (ii) Issuer 2(A) (for trading on July 26, 2017); and (iii) Issuer 3 (for trading between July 28 and July 31, 2017).  [Defs.' Reply Br. at 13 n.6; see also *infra* App'x A.]

In response, the SEC argues that Sabby's short sale transactions are not time-barred because it is seeking remedies that are not considered penalties under § 2462—namely, injunctive relief.  [Pl.'s Opp'n at 15.]  It urges the Court to deny Defendants' argument without prejudice because it "has not yet proposed civil penalty or

disgorgement amounts" as to the transactions it contends to be violations of the Exchange Act and the Advisers Act.  [*Id.* at 16.] The parties appear to acknowledge that Defendants' statute-of-limitations argument is not claim- or case-dispositive.

"Although statutes of limitations are ordinarily affirmative defenses, a court may dismiss a complaint for failure to state a claim if the allegations in the complaint, taken as true, show that relief is barred by the applicable statute of limitations."  *SEC v. Cohen*, 332 F. Supp. 3d 575, 587 (E.D.N.Y. 2018) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)); *see also Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (explaining that a party may raise a limitations defense on a motion to dismiss if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations").  Courts routinely scrutinize the allegations of a complaint to determine whether the SEC's claims for relief are timely under applicable statutes of limitation, such as § 2462.  *See, e.g.*, *Cohen*, 332 F. Supp. 3d at 587–88 ("While it is true that § 2462 speaks in terms of time-barred remedies, there is nothing unusual about the partial dismissal of claims to the extent they seek time-barred relief."); *CFTC v. WorldWideMarkets, Ltd.*, 2022 WL 3535993, at *6–9 (D.N.J. Aug. 18, 2022) (separately considering at the pleading stage whether § 2462 precluded claims for civil monetary penalties, injunctive relief, disgorgement, and restitution).

Section 2462, the default federal statute of limitations, provides that, except as modified by an act of Congress, "an action . . . for the enforcement of any civil fine, penalty, or forfeiture . . . shall not be entertained unless commenced within five years from the date when the claim first accrued."  28 U.S.C. § 2462.  "[A] claim accrues

'when the plaintiff has a complete and present cause of action.'" *Gabelli v. SEC*, 568

U.S. 442, 448 (2013) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)).  In *Gabelli*,

the Supreme Court held that the Government cannot invoke the "discovery rule"[15] to

delay accrual until the Government "discovers" the fraud giving rise to the cause of

action.  *Id.* at 454.  Section 2462's five-year limitation period begins when a defendant's

allegedly fraudulent conduct occurs.  *Id.*  Thus, on remand, the SEC's claim for civil

monetary penalties for a violation of the Advisers Act was found to be time-barred.

*See SEC v. Gabelli*, 518 F. App'x 32, 33 (2d Cir. 2013) (summary order).

Though the meaning of "civil fine" is straightforward, especially after *Gabelli*,

considerable litigation has ensued over the years regarding the meaning of "penalty"

under the statute.  For instance, in *Kokesh v. Securities & Exchange Commission*, 581 U.S.

455, 457 (2017), the Supreme Court resolved the question whether the disgorgement

remedy constitutes a "penalty" within the meaning of § 2462.  The Court answered

the question in the affirmative:  "Disgorgement, as it is applied in SEC enforcement

proceedings, operates as a penalty under § 2462.  Accordingly, any claim for

disgorgement in an SEC enforcement action must be commenced within five years of

the date the claim accrued."  *Id.* at 467.

---

[15] Under this rule, "the statute of limitations for a particular claim does not accrue until that claim is discovered, or could have been discovered with reasonable diligence, by the plaintiff." *Gabelli*, 568 U.S. at 447 (citing *SEC v. Gabelli*, 653 F.3d 49, 59 (2d Cir. 2011.))

However, in 2021, Congress passed the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ("**NDAA**"), Pub. L. No. 116-283, 134 Stat. 3388 (2021).  As relevant here, the NDAA included a new provision, 15 U.S.C. § 78u(d)(8), outlining several limitations periods for SEC actions.  *See* NDAA, Pub. L. No. 116-283, § 6501, 134 Stat. 3388, 4626 (2021) (codified at 15 U.S.C. § 78u(d)(8)).  The new provision established a ten-year statute of limitations for certain scienter-based claims for disgorgement.  *See* 15 U.S.C. § 78u(d)(8)(A)(ii).  Those claims include alleged violations of § 10(b) of the Exchange Act and § 206(1) of the Advisers Act.  *Id.* § 78u(d)(8)(A)(ii)(I), (III).  Courts have observed that the statute of limitations rubric in § 78u(d)(8) " 'expressly overruled *Kokesh*'s five-year statute of limitations as to certain securities violations.' "  *SEC v. Govil*, 86 F.4th 89, 101 n.10 (2d Cir. 2023) (cleaned up) (quoting *SEC v. Ahmed*, 72 F.4th 379, 396 (2d Cir. 2023)); *see also SEC v. Stubos*, 634 F. Supp. 3d 174, 189–91 (S.D.N.Y. 2022) (discussing the limitation periods applicable to each form of SEC relief, as modified by the NDAA).

Thus, in the wake of the NDAA, the SEC may pursue certain claims for relief within five years of the date on which the alleged violation occurred, and others within ten years.  *Compare* 15 U.S.C. § 78u(d)(8)(A)(i) (five years), *with id.* § 78u(d)(8)(A)(ii)(I)–(IV), (B) (ten years).  The five-year limitations period established in § 2462 continues to apply to civil monetary penalties.  *See SEC v. Sharp*, 626 F. Supp. 3d 345, 381 (D. Mass. 2022) ("[T]he statute of limitations for civil penalties has always been set at five-years under 28 U.S.C. § 2462.  As the SEC concedes, this statute of

limitations remains unchanged by the NDAA.") (internal citation omitted).  A ten-year limitation period now applies to claims for injunctive relief, and it applies retroactively.  *Id.* at 381–82 (citing 15 U.S.C. § 78u(d)(8)(B)); *see also SEC v. Gentile*, 939 F.3d 549, 552, 562 (3d Cir. 2019) (holding that "SEC injunctions that are properly issued and valid in scope are not penalties" under *Kokesh* "and thus are not governed by § 2462").  While non-scienter-based claims for disgorgement continue to be subject to a five-year statute of limitations, as in *Kokesh*, 581 U.S. at 457, a ten-year limitation period now applies to scienter-based claims for disgorgement.  *Sharp*, 626 F. Supp. 3d at 381; *Stubos*, 634 F. Supp. 3d at 190.

Here, Defendants contend that § 2462 precludes the SEC's claim for civil monetary penalties as to their trading in the securities of Issuers 1(A), 2(A), and 3. [Defs.' Br. at 16–20; Defs.' Reply Br. at 13 n.6; *see also infra* App'x A.]  The Court must agree.  As discussed above, Defendants' trading in the securities of Issuers 1(A), 2(A), and 3 is alleged to violate provisions of the Exchange Act and the Advisers Act. [Compl. ¶¶ 110–12, 117–29.]  Defendants' allegedly violative trading occurred between March 15 and 17, 2017, on July 26, 2017, and between July 28 and 31, 2017, respectively.  [*Id.* ¶ 98; App'x A.]  This conduct thus occurred prior to November 22, 2017—over five years before this action commenced (considering the applicable tolling period).  [Compl. ¶ 109.]  Though the SEC urges the Court to deny Defendants' argument without prejudice and to evaluate remedies after liability is determined, [Pl.'s Opp'n at 14–16], the SEC's argument is hardly a full-throated opposition.  As the answer is clear on the face of the Complaint, the Court should resolve the question

23

at the pleading stage.  *See Cohen*, 332 F. Supp. 3d at 587.  The Court finds that the SEC's claim for civil monetary penalties as to Defendants' trading prior to November 22, 2017, is untimely.  *See* 28 U.S.C. § 2462.  Accordingly, the SEC's claims under the Exchange Act and Advisers Act will be partially dismissed, to the extent based on Defendants' trading in the securities of Issuers 1(A), 2(A), and 3.  *See Gabelli*, 568 U.S. at 445; *Sharp*, 626 F. Supp. 3d at 381.

The same conclusion does not follow, however, concerning the SEC's claim for disgorgement.  Scienter-based claims for disgorgement, including violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and § 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1), are subject to a ten-year statute of limitations following enactment of the NDAA.  *See* 15 U.S.C. § 78u(d)(8)(A)(ii)(I), (III); *Sharp*, 626 F. Supp. 3d at 381; *Stubos*, 634 F. Supp. 3d at 189–90, 200.  "Non-scienter-based claims for disgorgement continue to require a five-year statute of limitations under the NDAA, *see* [15 U.S.C.] § 78u(d)(8)(A)(i), as they did under *Kokesh*, *see* 28 U.S.C. § 2462." *Sharp*, 626 F. Supp. 3d at 381.  While the Court agrees with Defendants' submission that none of the SEC's claims is brought under Section 206(1) of the Advisers Act, [Defs.' Br. at 19–20], so disgorgement as to the SEC's Advisers Act claims would be subject to a five-year statute of limitations, *compare* 15 U.S.C. § 78u(d)(8)(A)(ii)(III), *with id.* § 78u(d)(8)(A)(i), Defendants ignore the SEC's claim for disgorgement pursuant to its Exchange Act cause of action.  Because that claim is subject to a ten-year statute of limitations, *see* 15 U.S.C. § 78u(d)(8)(A)(ii)(I), and the parties do not dispute that the SEC brought its claims for disgorgement against Defendants within ten years, the

24

SEC's claim for disgorgement is timely to the extent pursued for a violation of the Exchange Act. *See Stubos*, 634 F. Supp. 3d at 200; *Sharp*, 626 F. Supp. 3d at 381. Accordingly, the Court will not preclude the SEC from seeking disgorgement as to Defendants' trading in the securities of Issuers 1(A), 2(A), and 3.

Finally, though Defendants do not appear to challenge the timeliness of the SEC's claim for injunctive relief in this action, the Court observes that there is no basis to preclude its claim for equitable relief on statute-of-limitations grounds. *See* 15 U.S.C. § 78u(d)(8)(B) (ten-year statute of limitations for an injunction); *Gentile*, 939 F.3d at 562 (holding that "SEC injunctions that are properly issued and valid in scope are not penalties" under *Kokesh* "and thus are not governed by § 2462"); *Sharp*, 626 F. Supp. 3d at 381–82 (finding it unnecessary to consider whether injunction should be deemed a "penalty" under the *Kokesh* standard, because the ten-year statute of limitations enacted by the NDAA applies retroactively). The SEC's Exchange Act and Advisers Act claims are thus timely, provided that the Court will preclude the SEC from seeking civil monetary penalties for Defendants' allegedly violative trading in the securities of Issuers 1(A), 2(A), and 3 pursuant to § 2462.

Recognizing that Defendants' statute-of-limitations arguments are not claim- or case-dispositive, and having found that the SEC's claims for relief are generally timely, except as noted above, the Court next considers the SEC's allegations on the merits.

**B.    Adequacy of the Alleged Violations of § 10(b) as to Appendix A.**

In its first claim for relief, the SEC asserts that Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5,

promulgated thereunder, as to Defendants' trading in all 10 issuers.  [Compl. ¶¶ 110–12.]   As noted above, Defendants contend that the SEC has failed to meet the heightened pleading standards of Rule 9(b) as to the trades identified in Appendix A. [Defs.' Br. 2–3, 10–14.]

Section 10(b) and Rule 10b-5 prohibit fraud in connection with the purchase or sale of securities.  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010); *SEC v. Desai*, 145 F. Supp. 3d 329, 335 (D.N.J. 2015).[16]  Specifically, § 10(b) prohibits "the use or employ[ment], in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5, in turn, renders the following conduct illegal in connection with the purchase or sale of any security:

> (a) to employ any device, scheme, or artifice to defraud;

> (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5(a)–(c).  Claims brought under Rule 10b-5(a) and (c) are referred to as "scheme liability" claims because they "make deceptive conduct actionable, as opposed to . . . deceptive statements," as in Rule 10b-5(b).  *See In re DVI, Inc. Sec. Litig.*,

---

[16] The Court recently provided an overview of securities fraud claims under § 10(b) and Rule 10b-5, albeit in the context of a private securities class action.  See *Roofer's Pension Fund v. Papa*, __ F. Supp. 3d __, __, 2023 WL 5287783, *3–5 (D.N.J. Aug. 17, 2023) (Bumb, C.J.).

639 F.3d 623, 643 n.29 (3d Cir. 2011). Here, the SEC invokes all three subsections against Defendants. [Compl. ¶ 111; Pl.'s Opp'n at 8 n.1.]

Accordingly, to state a claim under § 10(b) of the Exchange Act and Rule 10b-5 thereunder, courts require the SEC to plead sufficient facts to demonstrate that the defendants (1) made a misrepresentation or omission of material fact, or employed a fraudulent device, scheme, act, or practice, (2) with scienter, (3) in connection with the purchase or sale of a security. *See SEC v. Kearns*, 691 F. Supp. 2d 601, 614 (D.N.J. 2010) (citing *SEC v. Adoni*, 60 F. Supp. 2d 401, 405 (D.N.J. 1999)); *SEC v. Lucent Techs., Inc.* (*Lucent II*), 610 F. Supp. 2d 342, 349–50 (D.N.J. 2009) (citations omitted); *SEC v. Hug*, 2022 WL 855659, at *5 (D.N.J. Mar. 22, 2022).

Here, only the first two elements are disputed. Defendants contend that the SEC (1) has failed to identify alleged misstatements or a fraudulent scheme with particularity; (2) has failed to properly allege scienter; and (3) engages in improper group pleading. [Defs.' Br. at 8–16.] Each of these arguments is taken up in turn.

### 1.    Alleged Misstatements and Scheme Liability.

Defendants argue that the SEC's § 10(b) and Rule 10b-5 claim must be dismissed as to the Appendix A issuers because the SEC has failed to identify misstatements with particularity and only vaguely references a "fraudulent trading scheme." [Defs.' Br. at 10.] Defendants assert that the SEC has failed to provide the "who, what, when, where, and how" of the alleged fraud. [*See id.* at 10–12.]

In response, the SEC submits two arguments. First, it argues that Rule 9(b) does not require that it plead every detail of every alleged fraud forming the basis of its

Complaint.  [Pl.'s Opp'n at 4–5.]  Rather, because the SEC is alleging a fraudulent scheme or pattern of fraudulent conduct, it need only supply a representative sample of the alleged fraud.  [*Id.* at 6.]  Second, in any case, the SEC argues that its allegations are sufficient to state a plausible claim for fraud under Rule 10b-5(a), (b), and (c) as to Defendants' trading in all ten issuers.  [*Id.* at 7–9.]

The Court first considers whether the SEC can meet Rule 9(b)'s particularity requirements by pleading representative examples of fraud.  In support of its position, the SEC leans heavily on two False Claims Act ("**FCA**") cases:  *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552 (8th Cir. 2006) and *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153 (3d Cir. 2014).

In *Joshi*, a doctor (Dr. Joshi) brought a *qui tam* action under the FCA against a hospital (St. Luke's) and its chief of anesthesiology (Dr. Bashiti).  441 F.3d at 553–54.  He alleged that the hospital and the chief of anesthesiology conspired and submitted false claims to the government seeking payment for anesthesia services, medical supplies, and prescriptions.  *Id.*  Examining the sufficiency of his allegations of fraud, the court agreed that the doctor had failed to satisfy Rule 9(b)'s particularity requirement.  *See id.* at 556 ("Simply put, the complaint fails to identify specifically the 'who, what, where, when, and how' of the alleged fraud.").  Recognizing, however, that the doctor had alleged a wide-ranging fraudulent scheme—a "systematic practice of St. Luke's and Dr. Bashiti submitting and conspiring to submit fraudulent claims over a sixteen-year period"—the court explained that Rule 9(b) provides some latitude:

> Clearly, neither this court nor Rule 9(b) requires Dr. Joshi to allege specific details of *every* alleged fraudulent claim forming the basis of Dr. Joshi's complaint.   However, to satisfy Rule 9(b)'s particularity requirement and to enable St. Luke's and Dr. Bashiti to respond specifically to Dr. Joshi's allegations, Dr. Joshi must provide *some* representative examples of their alleged fraudulent conduct, specifying the time, place, and content of their acts and the identity of the actors.

*Id.* at 557.

In *Foglia*, the Third Circuit considered a split between the circuits on what a plaintiff must show at the pleading stage to satisfy Rule 9(b)'s particularity requirement in the context of an FCA action.  754 F.3d at 155.  The *Foglia* court observed that the Fourth, Sixth, Eighth, and Eleventh Circuits require a plaintiff to show "representative samples" of the allegedly fraudulent conduct, specifying the time, place, and content of the acts and the identity of the actors.  *Id.* at 155–56 (citing *Joshi*, 441 F.3d at 557) (other citations omitted).   Contrasting those courts' approach with the "more nuanced" reading of the First, Fifth, and Ninth Circuits, the *Foglia* court determined that the "nuanced" approach would suffice:  to satisfy Rule 9(b) for a claim under the FCA, it is sufficient for a plaintiff to allege " 'particular details of a fraudulent scheme paired with reliable indicia that lead to a strong inference that claims were actually submitted.' "  *Id.* at 156 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)); *see also id.* at 157–58.

Having reviewed these cases, the Court is not persuaded that the "relaxed" approach to Rule 9(b)'s particularity requirement in the FCA context is applicable to a securities fraud action.  While some courts appear to credit this approach in actions brought by the SEC under federal securities laws, *see, e.g.*, *SEC v. Bluepoint Inv. Counsel,*

*LLC*, 2021 WL 719647, at *15 (W.D. Wis. Feb. 24, 2021) ("[D]istrict courts in this circuit have held that 'a plaintiff who pleads a fraudulent scheme involving numerous transactions over a period of years need not plead specifics with respect to every instance of fraud, but it must at least provide representative examples.' ") (cleaned up) (quoting *United States ex rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc.*, 895 F. Supp. 2d 872, 878 (N.D. Ill. 2012)), this Court is not aware of binding authority in the Third Circuit authorizing it to do so.  In fact, the Fifth Circuit in *Grubbs*—a case that the *Foglia* court endorsed in adopting a "nuanced" approach to satisfying Rule 9(b)'s particularity requirement in an FCA action, see *Foglia*, 754 F.3d at 156—even contrasted claims under the FCA from securities fraud claims.  *See Grubbs*, 565 F.3d at 189 ("[A] claim under the False Claims Act and a claim under common law or securities fraud are not on the same plane in meeting the requirement of 'stat[ing] with particularity' the contents of the fraudulent misrepresentation.") (alteration in original).  Therefore, the Court concludes that the SEC cannot avoid Rule 9(b)'s particularity requirements as to the Appendix A transactions by reference to their representative sample theory and a body of FCA cases.  As the SEC contends that each transaction identified in Appendix A constitutes a § 10(b) violation, the Appendix A allegations must themselves be sufficiently stated with particularity.

Still, the SEC need not rely on the FCA's "nuanced" pleading standard to clear this sticky wicket:  Rule 9(b) does not require the SEC to allege "every material detail of the fraud, such as the date, location, and time," so long as it uses "alternative means of injecting precision and some measure of substantiation into [its] allegations of

fraud." *In re Rockefeller*, 311 F.3d at 216 (citation omitted).  Ultimately, the question is whether the allegations are sufficient to "place the defendant on notice of the 'precise misconduct with which it is charged.' " *Frederico*, 507 F.3d at 200 (quoting *Lum*, 361 F.3d at 223–24) (cleaned up).  In this sense, SEC's allegations concerning Issuers 1 and 2 should inform the Court's consideration of Appendix A as it asks whether the table contains the material details of allegedly violative trading as part of a "long running fraudulent scheme" to circumvent Regulation SHO.

Here, the SEC alleges that Defendants (a) submitted false trading orders to executing broker-dealers for long sales as to the issuers identified in Appendix A when the Private Funds did not have net long positions or (b) submitted short sale trading orders to executing broker-dealers for short sales as to the issuers identified in Appendix A while misrepresenting that Defendants had obtained sufficient "locates." [Compl. ¶ 98; see also *infra* App'x A.]  In other words, the SEC alleges that Defendants engaged in the exact same two forms of abusive trading in the securities of the Appendix A Issuers as described concerning the securities of Issuers 1 and 2. [Pl.'s Opp'n at 6–9; Compl. ¶¶ 41–95.]  While the SEC cannot rely on "representative examples" of adequately pleaded trading violations to bootstrap inadequately pleaded trading violations, see *supra* at pp. 29–31, each instance of Defendants' allegedly abusive trading should be considered together.  This action only involves two forms of circumventing Regulation SHO.

Consider the SEC's allegations concerning Defendants' trading in Issuer 4 as an example.  The SEC alleges that, between June 25 and July 6, 2018, Defendants

submitted orders on behalf of the Warrant Fund to an executing broker-dealer for sales of 381,642,544 shares of Issuer 4 that were marked as long sales when, in fact, they were short sales. [Compl. ¶ 98; see *infra* App'x A, Row 5.] This instance of "naked" short selling resulted in $204,169.89 of profits. [*Id.*] The SEC argues that "there is absolutely no ambiguity about what Defendants did and why it was wrong." [Pl.'s Opp'n at 7.]

The Court must agree. Though it may be unorthodox to rely on an appendix containing a table to supply the material allegations of fraud, the Court will not prioritize form over substance. The Complaint and the information contained in Appendix A together contain the necessary facts to comply with Rule 9(b)'s particularity requirement and survive dismissal. As to Issuer 4, the SEC alleges that Defendants—through the Warrant Fund managed by Sabby and controlled by Mintz—authorized the "naked" short sales, submitting mismarked orders to executing broker-dealers (who); that the short sale orders were mismarked as long sales (how); that the orders resulted in the sale of 381,642,544 shares of Issuer 4 (what); that such sales reaped over $200,000 in proceeds (why); and that such conduct occurred between June 25 and July 6, 2018 (when). [Compl. ¶ 98; see *infra* App'x A, Row 5.] These allegations plainly refer to the material misstatements giving rise to the alleged § 10(b) violation—*i.e.*, that the short sale orders were mismarked as long sales, in contravention of Regulation SHO (*i.e.*, 17 C.F.R. § 242.200(g)). *See Kearns*, 691 F. Supp. 2d at 614 (explaining that, to state a prima facie violation of § 10(b) and Rule 10b-5, the SEC must, among other things, identify that the defendant made a

misrepresentation).   Accordingly, the information contained in Appendix A is sufficient to place Defendants on notice of the precise misconduct with which they are charged.[17, 18]   *See Frederico*, 507 F.3d at 200.

Defendants also submit that the SEC has failed to sufficiently allege scheme liability under Rule 10b-5(a) or (c).  [Defs.' Br. at 10–11; Defs.' Reply Br. at 10–12.]  A party can incur liability for employing a fraudulent scheme or engaging in any fraudulent act in connection with the purchase or sale of any security, even without making an oral or written statement.  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 158 (2008).  To state a claim for scheme liability under Rule

---

[17] In so holding, the Court rejects Defendants' argument that the Complaint fails to explain Mintz's role in the Appendix A transactions and to attribute particular misstatements to him.  [Defs.' Reply Br. at 7.]  The SEC has alleged that Mintz, as the principal and managing partner of Sabby during the relevant period, had responsibility for making investment decisions for the Private Funds and the obligation to consult trading records prior to authorizing a sale order.  [Compl. ¶¶ 15, 37–39.]  It further alleges, as to each Appendix A transaction, whether Mintz authorized orders with false information about the number of locates obtained *or* orders that were mismarked as long sales.  [*Id.* ¶¶ 98; App'x A.]  While the level of detail that the SEC includes is indisputably less than its allegations regarding the allegedly violative trading in Issuers 1 and 2, the SEC has set forth sufficient information to enable Defendants to discern the material allegations of fraud as to each Appendix A Issuer.  *See SEC v. Gu*, 2022 WL 2753478, at *3 (D.N.J. July 13, 2022) ("Despite Defendant's protests, he is not prevented from meaningfully being able to respond to the Complaint . . . This Court will therefore deny his motion.") (internal quotation marks omitted).

[18] While the Court concludes that, in this instance, the SEC's allegations are sufficient to comply with Rule 9(b)'s heightened pleading requirements, this Opinion should not be construed as an open-ended approval of the SEC's practice more generally—*i.e.*, summarizing material allegations of fraud in an appendix attached to the operative complaint.  In another case, this practice may require the SEC to replead its allegations in narrative form and in separately numerated paragraphs to clarify the circumstances of fraud as to each occurrence.  For the reasons already explained, however, this result will not be required here, but the SEC is forewarned.

10b-5(a) or (c), the SEC must allege "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter." *Lucent II*, 610 F. Supp. 2d at 350. "[M]isstatements and omissions can form *part* of a scheme liability claim, but an actionable scheme liability claim also requires something *beyond* misstatements and omissions, such as dissemination." *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).

Here, Defendants contend that the SEC has not pleaded a single fraudulent scheme, but rather attempted to plead multiple schemes involving different issuers and transactions. [Defs.' Reply Br. at 10.] Defendants also argue that reliance on scheme liability cannot save the SEC's failure to identify particular misstatements attributable to each Defendant. [*Id.* at 10–11.] Neither argument is convincing.

Viewing the information identified in Appendix A in the context of the SEC's other allegations concerning trading in the securities of Issuers 1 and 2, [Compl. ¶¶ 41–95], the Court concludes that the SEC has identified deceptive conduct independent of its allegations that Defendants made false or misleading statements. As noted above, the SEC alleges that Defendants "submitted" false and misleading trade order instructions or false and misleading representations concerning the number of "locates" obtained. [Compl. ¶ 98.] A fair inference from these allegations is that Mintz authorized the dissemination of false information and participated in concealing information from executing broker-dealers. As to Issuers 1 and 2, for instance, Mintz allegedly resisted efforts by Executing Broker-Dealer A to obtain documentation to

confirm that Defendants had a sufficient number of "locates" prior to submitting their short sale orders. [*Id.* ¶¶ 61–69.] The SEC also alleges that Defendants were previously sanctioned for violating Rule 105 of Regulation M on two occasions, resulting in the imposition of a cease-and-desist order, disgorgement, and a civil penalty.[19] [*Id.* ¶ 16.] The Appendix A transactions, in this light, are alleged to be "part of a fraudulent scheme to circumvent trading rules." [*Id.* ¶ 97.] Based on these allegations, the Court determines that the SEC has sufficiently identified the circumstances of the alleged fraudulent conduct—repeated circumvention of Regulation SHO and efforts to conceal Defendants' scheme. *See Lorenzo v. SEC*, 587 U.S. __, __, 139 S. Ct. 1094, 1101 (2019) (observing that the words "device," "scheme" and "artifice" in Rule 10b-5 "capture a wide range of conduct"). Though based on the alleged misstatements, the SEC's scheme liability claim contains the "something extras" required to survive dismissal. *See Stubos*, 634 F. Supp. 3d at 201.

---

[19] The SEC permissibly identifies that Sabby has been previously sanctioned by the Commission for improper short sales, [Compl. ¶ 16], and the Court recognizes that this allegation is relevant here. However, in connection with identifying Sabby's Regulation M violations, it labels Sabby a "recidivist," [*id.* ¶ 1], and impugns Mintz's reputation accordingly. This is inappropriate. Rule 105 of Regulation M has a different set of requirements from Regulation SHO. The Court exercises its authority to strike the SEC's reference to Sabby as a "recidivist" as impertinent and scandalous. *See* Fed. R. Civ. P. 12(f)(1) (recognized that a court may *sua sponte* "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter").

### 2.      Scienter.

Next, the Court considers Defendants' argument that the SEC's § 10(b) claim must be dismissed because it fails to allege any plausible inference of scienter in connection with Defendants' trading in the Appendix A issuers.  [Defs. Br. at 12–14.]

As noted, a claim under § 10(b) of the Exchange Act and Rule 10b-5 thereunder requires a showing of scienter.  *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 191–92 (3d Cir. 2000) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 272–73 (3d Cir. 1998); and *McLean v. Alexander*, 599 F.2d 1190, 1196–97 (3d Cir. 1979)).  "Scienter is 'a mental state embracing intent to deceive, manipulate or defraud,' . . . [and] the scienter required for securities fraud includes recklessness."  *Infinity Grp.*, 212 F.3d at 192 (quoting *Hochfelder*, 425 U.S. at 193 n.12).

To establish scienter, the SEC must either (1) "identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud."  *In re Burlington Coat Factory*, 114 F.3d at 1422 (citation omitted); *see SEC v. Lucent Techs., Inc.* (*Lucent I*), 363 F. Supp. 2d 708, 717 (D.N.J. 2005) (applying these standards in an SEC enforcement proceeding); *SEC v. Rivero*, 2023 WL 2238700, at *8 (D.N.J. Feb. 27, 2023) (same); *SEC v. RRBB Asset Mgmt., LLC*, 2021 WL 3047081, at *2 (D.N.J. July 20, 2021) (same). "To establish a corporation's scienter, the mental state of an officer acting on the corporation's behalf may be imputed to it." *SEC v. Cooper*, 142 F. Supp. 3d 302, 313

(D.N.J. 2015) (Bumb, J.).  The SEC need not allege scienter with particularity, but its allegations must support a plausible inference of scienter.  *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *Dubovoy*, 2016 WL 5745099, at *5 (explaining that in a securities fraud action, the SEC need only allege facts that give rise to a plausible inference of scienter) (citing *McGee*, 895 F. Supp. 2d at 683).

Here, the Court is satisfied that the SEC has alleged circumstances suggesting that Defendants knowingly or recklessly engaged in the alleged fraud.  As noted above, the SEC alleges that, in each instance identified in Appendix A, Defendants "knowingly and recklessly" either submitted (a) false and misleading sale orders or (b) short sale trading instructions while misrepresenting that they had a sufficient number of "locates."  [Compl. ¶ 98.]  Defendants engaged in these two forms of abusive trading, the SEC alleges, because "it was profitable to do so and more profitable than following the requirements of Regulation SHO."  [*Id.* ¶ 99.]  The SEC also asserts that the Appendix A transactions are materially similar to Defendants' trading in the securities of Issuers 1 and 2, as further evidenced by "Sabby's prior history of short sale violations in connection with Rule 105 of Regulation M."  [*Id.* ¶ 97; *see also id.* ¶¶ 41– 95.]  In this vein, the SEC alleges that Defendants concealed their misconduct as to such issuers:  Mintz misstated the source of the "locates" for Defendants' trades in the securities of Issuer 1 when there were no locates on file.  [*See id.* ¶¶ 63–64.]  He later acknowledged that he was personally aware of the Warrant Fund's position in the common stock of Issuer 1 on June 21 and 22, 2018; that Defendants had not tendered

37

their convertible securities prior to placing the trades; and that Defendants' trades as to Issuer 1 were mismarked.  [*Id.* ¶ 71.]

Considering these allegations in their totality and situating the Appendix A transactions in their proper context—as part of a relevantly similar pattern of circumventing the requirements of Regulation SHO for years—the Court concludes that the SEC has raised a plausible inference that Defendants knowingly or recklessly engaged in the alleged fraud.  *See Dubovoy*, 2016 WL 5745099, at *5 (explaining that allegations concerning similar trading pattern, among other things, supported inference that defendant intended to participate in the alleged fraud); *SEC v. Riel*, 282 F. Supp. 3d 499, 521 (N.D.N.Y. 2017) (explaining that, to state a claim for securities fraud based on recklessness, it suffices to allege a defendant's knowledge of facts that are contradicted by public statements) (citation omitted); *SEC v. Constantin*, 939 F. Supp. 2d 288, 308 (S.D.N.Y. 2013) ("Representing information as true while knowing it is not, recklessly misstating information, or asserting an opinion on grounds so flimsy as to belie any genuine belief in its truth, are all circumstances sufficient to support a conclusion of scienter.") (citation and internal quotation marks omitted).

Separately, the Court is satisfied that the SEC has pleaded sufficient facts to show that Defendants had both the motive to engage in abusive trading in circumvention of Regulation SHO and the clear opportunity to do so.  Avoiding the "locate" requirements and failing to deliver securities by their settlement date enable a trader to manipulate the price of a security and avoid borrowing costs, leaving the trader with more money in his pockets.  *See "Naked" Short Selling Antifraud Rule*, SEC

Release No. 34-58774, 73 Fed. Reg. 61666, 61667 (Oct. 17, 2008) (observing that sellers sometimes "intentionally fail to deliver securities as part of a scheme to manipulate the price of a security, or possibly to avoid borrowing costs associated with short sales."). No reasonable reading of the Complaint could generate doubt about Defendants' alleged motive here: avoiding the costs associated with applicable regulatory requirements to earn Defendants higher (illicit) profits. *See, e.g.*, *Rivero*, 2023 WL 2238700, at *9 ("As for motive and opportunity, money is the motive[.]"); *RRBB Asset Mgmt.*, 2021 WL 3047081, at *5 (explaining that the SEC had alleged motive because defendant "could profit handsomely" from trading decisions). Similarly, Defendants' opportunity to mismark sale orders and lie to executing broker-dealers about the number of "locates" they had obtained and to profit accordingly is obvious, and Defendants do not argue otherwise.

Accordingly, the Court concludes that the SEC has satisfied its burden to plead scienter "generally." *See* Fed. R. Civ. P. 9(b); *Lucent I*, 363 F. Supp. 2d at 717.

### 3.    Group Pleading.

Finally, the Court addresses Defendants' argument that the SEC's claim under § 10(b) and Rule 10b-5 must be dismissed because it impermissibly "lumps Defendants" together. [Defs.' Br. at 14–15 (citing *Kennilworth Partners L.P. v. Cendant Corp.*, 59 F. Supp. 2d 417, 430 (D.N.J. 1999)).] It is true that a plaintiff does not state a claim for securities fraud against a group of defendants with the requisite particularity when it fails to state the role each defendant played in the fraud. *See Kennilworth*, 59 F. Supp. 2d at 428–29, 430 (dismissing § 10(b) and Rule 10b-5 claims because plaintiffs

"lump[ed] the defendants together and ma[de] general conclusory allegations of wrongdoing").  This result follows from Rule 9(b)'s particularity requirement.  *Id.* Accordingly, the purpose of the proscription against group-pleading in this context is to ensure each defendant has notice of the "precise misconduct" with which he is charged.  *See id.* (citing *Rolo v. City Inv. Co. Liquidating Tr.*, 155 F.3d 644, 658 (3d Cir. 1998)).

Here, unlike in *Kennilworth* and the other cases that Defendants cite in their moving brief,[20] the SEC is not asserting § 10(b) and Rule 10b-5 claims against a group of defendants who each have different roles in the alleged fraudulent scheme.  Rather, as the only actor, Mintz is alleged to be at the center of the scheme, and Sabby is alleged to be liable for Mintz's conduct because Mintz acted in furtherance of the fraud on the entity's behalf.  [*See* Compl. ¶ 15 (referring to Mintz as the principal and managing partner of Sabby and stating that, "[b]ecause of his position, Sabby is liable for Mintz's conduct").]  It is thus clear what Mintz's role was in the alleged fraud. Courts typically reject the impermissible-group-pleading argument where, as here, a defendant's role in an alleged fraud is readily discernable from the pleading.  *See, e.g.*, *SEC v. Mannion*, 789 F. Supp. 2d 1321 (N.D. Ga. 2011) (rejecting defendants' argument that pleading conflated their conduct and engaged in conclusory group pleading).

---

[20] See *Ingris v. Borough of Caldwell*, 2015 WL 3613499, at * 5 (D.N.J. June 9, 2015); *Russo v. Thor Indus., Inc.*, 2020 WL 5868801, at *3 (D.N.J. Oct. 1, 2020); *Lucent I*, 363 F. Supp. 2d at 724.

Moreover, there is no suggestion in the pleading that Sabby is liable for conduct that is independent of or separate from Mintz's actions.  In other words, the SEC asserts that Sabby is vicariously liable for Mintz's scheme to circumvent Regulation SHO.  In such circumstances, courts look to agency-law principles and consider the conduct and scienter of the primary violator to determine whether the corporate defendant can be liable under § 10(b) and Rule 10b-5.  *See SEC v. Complete Bus. Solutions Grp., Inc.*, 538 F. Supp. 3d 1309, 1336 (S.D. Fla. 2021) ("The principles of agency may be used to impute the actions of corporate officers and directors to the corporation itself . . . in essence, making the corporation liable under § 10(b) and Rule 10b-5.") (cleaned up) (quoting *APA Excelsior III, L.P. v. Windley*, 329 F. Supp. 2d 1328, 1353 (N.D. Ga. 2004)).  Because the Court has concluded that the SEC's allegations are sufficient against Mintz, it can readily impute his conduct and scienter to Sabby.  *See Cooper*, 142 F. Supp. 3d at 316–17 ("Because Cooper has the requisite scienter, it may be imputed to the Cooper Companies as well.") (citing *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106–07 (10th Cir. 2003)); *CFTC v. Traders Glob. Grp. Inc.*, 2023 WL 7545316, at *11 (D.N.J. Nov. 14, 2023) ("Overall, the Court finds that the CFTC has met its *prima facie* burden to show scienter as to Defendant Kazmi, based on his own knowledge, and his relationship to Mr. Dentrinos and iSRisk.  And, as the sole executive of Traders Global, Defendant Kazmi's scienter may be imputed to the corporate Defendants.").  The SEC's theory of fraud is sufficient to clear the pleading stage of this action.

## V.     CONCLUSION

For the reasons expressed above, Defendants' Motion to Dismiss will be

**GRANTED**, **in part**, and **DENIED**, **in part**.  An Order shall issue separately.


<u>**s/Renée Marie Bumb**</u>
RENÉE MARIE BUMB
Chief United States District Judge

DATED: <u>**March 18, 2024**</u>

**APPENDIX A**

| Issuer | Fund(s) Engaged in Trading | Locates | Number of Occasions Locates Denied | Total Naked Short Sales | | Total Naked Short Sales Shares & Proceeds | Profit After Acquiring Shares For Delivery | Date Range | Reset Provision |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Orders With False Representations Concerning Locates | Short Sale Orders Mismarked as Long Sales | | | | |
| Issuer 1 | Warrant Fund and Healthcare Fund | | | 67,760 | 1,100 | 68,860 $438,578 | $202,810 | 3/15/2017 – 3/17/2017 | No |
| Issuer 2 | Warrant Fund and Healthcare Fund | | | 877,540 | 0 | 877,540 $1,470,521 | $347,270 | 7/26/2017 | No |
| Issuer 3 | Warrant Fund and Healthcare Fund | 45 | | 280,150 | 0 | 280,150 $727,818 | $307,390.75 | 7/28/2017 – 7/31/2017 | No |
| Issuer 4 | Warrant Fund | | | 0 | 381,642,544 | 381,642,544 $922,689 | $204,169.89 | 6/25/2018 – 7/6/2018 | No |
| Issuer 5 | Warrant Fund | | | 0 | 527,778 | 527,778 $412,241 | $81,691 | 7/11/2018 – 7/12/2018 | Yes.  Naked short sold 400,150 shares in advance of a warrant conversion price reduction effective July 12, 2018, and exercised warrants *after* the conversion price reduction. |
| Issuer 6 | Warrant Fund | | | 7,638,623 | 0 | 4,596,514 $329,597 | $83,222 | 7/20/2018 – 7/23/2018 | No |

**APPENDIX A**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Issuer 7 | Warrant Fund | | | 210,939 | 0 | 196,262<br><br>$343,226 | $341,184 | 2/25/2019 – 3/5/2019 | No |
| Issuer 8 | Warrant Fund | | | 119,181 | 0 | 119,181<br><br>$944,101. | $345,242. | 5/1/2019 – 5/6/2019 | No |